UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL HERRERA,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>JAMES D. HARTLEY,<br><br>　　　　Respondent. | Case No.: 1:12-cv-01357-JLT<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS (Doc. 1)<br><br>ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT AND CLOSE FILE<br><br>ORDER DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY |

Petitioner is in the custody of the California Department of Corrections and Rehabilitation serving a determinate sentence of eight years after having been convicted in the Fresno County Superior Court in 2010 for rape. In this habeas corpus petition, he claims there was insufficient evidence presented to support the charge. For the reasons set forth below, the Court will **DENY** the petition.

I.  **Factual Background**

The Court adopts the Statement of Facts in the 5th DCA's published/unpublished decision[1]:

Introduction
Appellant was convicted of the rape of M., the 34–year–old niece of his former girlfriend, Maria Q. The relationship between Maria Q. and appellant ended in 2008 because Maria Q.'s

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

1

sons and appellant disliked one another.

### Events Leading to the Charged Offense

In September 2009, M. went to Maria Q.'s Kerman home to stay over and to attend the Kerman Harvest Festival. On the evening of September 13, 2009, Maria Q., M., and M's two sisters, went to the festival. They encountered appellant at the festival. He followed them and tried to talk to Maria Q., but Maria Q. wanted him to go away. Appellant attempted to speak with Maria Q. for a period of time. Although police were patrolling the area, the four women did not contact officers, and appellant eventually went away. One of M.'s sisters heard appellant say in an angry manner that they were "gonna get it."

M. and Maria Q. left the festival a little before midnight. Both women went to M.'s cousin's house for a visit. Maria Q. departed for home after a few minutes at the cousin's house. M. left the cousin's house for the Maria Q. home at about 1:00 a.m. M. and Maria Q. shared a bed, their custom when M. visited Maria Q.'s home.

### The Charged Offense

At 5:00 a.m., M. awakened and found someone on top of her engaged in intercourse. M. had gone to bed wearing a pair of jeans, but she was no longer wearing them. M., who stood 5 feet three inches tall and weighed 122 pounds, tried to push the man off of her for what "seemed [to be] five to seven minutes." She said she repeatedly shouted and yelled, "Who are you?" and "Get off." M. said appellant was engaged in intercourse with her, but she did not know whether he ejaculated. Although M. shouted, Maria Q. apparently did not hear her, even though she was asleep on the same bed. M.'s cousin, Daniel, and Daniel's friend, Rico, were sleeping on couches in the adjacent living room, but they did not hear her either. As the man engaged in intercourse, he instructed M., "Shhh, be quiet." The man eventually got off of M.

M. grabbed her pants from the bed, ran out of the bedroom, and went into a bathroom. On the way to the bathroom, she passed by her cousin, Daniel, who was asleep on one couch, and her sister's boyfriend, "Rico", who was asleep on another couch. M. said [she] "freaked out" and was hysterical and crying in the bathroom. She composed herself after a few minutes, went back to the bedroom, and turned on the light to determine the identity of the male in the bed. M. said her aunt was lying on the bed near the headboard, which was located against the bedroom wall. M. saw appellant lying on the covers of the bed.

M. started screaming and hitting the appellant. Her screams awakened her aunt, Daniel, and Rico. M. said she had been asleep in the bed with her head at the foot of the bed, and that appellant had been positioned the same way. When she returned from the bathroom, appellant's head was near Maria Q.'s head, at the top of the bed. Maria Q. said she heard M. scream, "Tia, Tia!" and awakened. Maria Q. said she saw M. strike appellant, who was on the floor looking for his shoes. Maria Q. ran to the bedroom door and closed it to keep Daniel and Rico from entering the bedroom to attack Herrera. Maria Q. also testified she opened the door to check on her son and saw Daniel and Rico still resting on the living room couches. At some point, appellant left Maria Q.'s home through the bedroom window.

M. told her aunt what appellant had done to her. Maria Q. walked to the nearby Kerman Police Station and also telephoned the police dispatch. While Maria Q. went for the police, M. started to run to her mother's home, which was located about a block away from Maria Q.'s home. Rico ultimately gave M. a ride to her mother's home. M. gathered her possessions together at her mother's home and then returned to Maria Q.'s home to gather the rest of her belongings. She intended to collect all of her possessions and then drive to her own home in Fresno. The Kerman Police were present when M. and Rico returned to Maria Q.'s home.

At 6:00 a.m., Maria Q. met with Kerman Police Officer Sandra Mendoza at the police station. Officer Mendoza accompanied Maria Q. back to her residence. One person was asleep in the living room when Mendoza arrived. M. returned while Mendoza was present. M. was agitated and Mendoza took her to the police station for an interview. After the interview, Officer Mendoza summoned an ambulance to take M. to Community Regional Medical Center for examination. Mendoza said she spent several hours with M. at the hospital. Mendoza did not see any signs that M. was intoxicated but did say her demeanor alternated between anger and tears. Mendoza testified that M. was "pretty verbal about telling me what was going on, then she would just shut down, cry, and not answer my questions."

At 6:30 a.m. that same day, Kerman Police Officer Tom Chapman photographed some shoe prints in the soil under Maria Q.'s bathroom window. Officer Chapman found a cell phone, sandal, and shoe prints under the south window of Maria Q.'s bedroom and a size 11 shoe inside Maria Q.'s bedroom. The shoe prints outside the south bedroom window and the bathroom were consistent with the shoe Chapman found inside the bedroom.

Appellant was placed under arrest on September 14, 2009. Kerman Police Officer Ron Gaxiola collected the underwear appellant had been wearing at the time of arrest and booked that underwear into evidence. Officer Gaxiola also collected several cheek swabs from appellant.

## Scientific Evidence

A. M.'s Vaginal Swabs

At 6:57 a.m. on September 13, 2009, M. met Karen Reid at the Community Regional Medical Center emergency room. Reid testified that she was a registered nurse and a SAFE R.N. (sexual assault forensic examiner). Reid conducted an interview with M. and collected four swabs from M.'s vagina and cervix. Three swabs were used to prepare slides. Reid examined one slide and saw no sperm. Reid also collected reference samples from M., including hair, saliva, urine, and blood. The slides, the four swabs, and the reference samples were sent to the crime lab.

Kiffin Nelson, a criminalist at the DOJ Fresno Regional Laboratory, received the sexual assault kit with the samples collected by Reid. First, Nelson stained and examined the slides to determine whether any sperm were found in M.'s vaginal area. Nelson observed epithelial cells, but no sperm. Next, Nelson tested the vaginal swabs for the presence of acid phosphatase, a component in seminal fluid. All four swabs were negative. Third, Nelson conducted a differential extraction with the material on two swabs to separate the sperm DNA from the non-sperm DNA. She used an enzyme intended to break open the vaginal epithelial cells, but leave any sperm intact. At this point, she examined the results of one swab on a slide and found what appeared to be a single sperm. A slide of the second swab revealed two sperm.

Nelson extracted the DNA from the vaginal swabs into sperm and non-sperm fractions. When she tested the sperm fraction, she determined that very low levels of male DNA (and high levels of female DNA) were present. In this situation, technology that specifically targets the Y chromosome, which is present only in males, can be used to analyze the low levels of male DNA. This technology tests for short tandem repeats (STR's) on the Y chromosome, ignoring any female DNA in the mixture.

Nelson arranged for a senior criminalist at the DOJ Fresno Regional Laboratory, Lora Bailey–Van Houton, to test the sperm fraction with "STR Y typing." When Bailey–Van Houton tested the sperm fraction, she determined that the sample contained DNA from two males, and appellant was not one of them. He was eliminated as a donor of sperm DNA. Bailey–Van Houton explained that the test was sensitive enough to detect sperm that had been present for up to a week or so.

When Bailey–Van Houton tested the non-sperm fraction of the vaginal swab DNA, which was presumed to contain mostly female DNA, she determined that low levels of male DNA were present. She found that the genetic profile of the male DNA was consistent with appellant's genetic profile, which was expected to occur randomly in one in 1,047 Caucasian males and one in 561 Hispanic males. Bailey–Van Houton explained that the non-sperm male DNA could have come from saliva, blood, or seminal fluid (such as in pre-ejaculate). If during intercourse the male did not ejaculate, or had undergone a vasectomy, sperm would not likely be found with a vaginal swab.

B. Appellant's Underwear

Nelson also tested appellant's underwear. She swabbed the inside of the crotch and waistband. She examined a slide and saw no sperm, so she proceeded to extract the DNA from the swab. The DNA was analyzed at 15 different loci with STR testing. The results established that the sample was a mixture of at least two people, although in her opinion it contained only two. As expected, one genetic profile in the mixture was consistent with appellant's genetic profile. The other genetic profile was consistent with M.'s genetic profile, and therefore she could not be eliminated as a contributor of that DNA. That profile was expected to occur randomly in one out of 6.8 quadrillion African–Americans, one out of 200 quintrillion Caucasians, and one out of 390 trillion Hispanics. (The population of the earth is approximately 6.5 billion people.) Thus, it was extremely unlikely that the DNA came from someone other than M.

Defense Evidence

Ruth Ballard, Ph.D., testified that she was a professor of biological sciences at California State University, Sacramento, the DNA biology advisor for the Forensic Science Graduate Program at the University of California at Davis, and an adjunct professor of environmental toxicology at U.C. Davis. Ballard reviewed the work done by Nelson and Bailey–Van Houton. Ballard agreed with Nelson that the second genetic profile in the mixture from appellant's underwear was not a complete profile. She noted that the mixture contained a large amount of appellant's DNA, as would be expected from his own underwear, and a small amount of another person's DNA.

As for the vaginal swab DNA, Ballard explained that, given the low levels of DNA that were found, the acid phosphatase test could have been negative even though seminal fluid was actually present.

On cross-examination, Ballad testified that she did not disagree with the findings of either Nelson or Bailey–Van Houton. Ballard stated that Nelson's report on the underwear DNA was correct and proper.

Alan Barbour, Ph.D. testified that he was a forensic alcohol supervisor and associate laboratory director at Central Valley Toxicology in Clovis, California. Central Valley Toxicology tested M.'s blood and urine samples. According to Dr. Barbour, the blood sample showed a 0.07 blood-alcohol content at 10:30 a.m. on the morning after the incident. Dr. Barbour testified that a 0.07 blood-alcohol level would have required an individual to consume, at a minimum, "about eight regular beers or the equivalent in some other form of alcohol." Dr. Barbour also said "[f]our 24–ounce 5–percent beers would get you awful close [to the 0.07 blood-alcohol level at 10:30 a.m.]."

(Doc. 18, Ex. A, pp. 2-5).

///

///

**II.     Discussion**

      A.     <u>Jurisdiction</u>

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

      B.     <u>Legal Standard of Review</u>

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003); <u>Williams</u>, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005), citing <u>Williams</u>, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500. A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

### III. Petitioner's Claim

The petition only that insufficient evidence was presented to establish the victim was raped.

A. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

**B. Substantive Law of Rape**

Rape is a general intent offense. (People v. Griffin (2004) 33 Cal.4th 1015, 1022.) Forcible "[r]ape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator ... [¶] ... against the person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of another." (People v. Rundle (2008) 43 Cal.4th 76, 138, citing section 261, subdivision (a)(2), disapproved on another point in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22; People v. Lewis (2009) 46 Cal.4th 1255, 1290.) "'[A]gainst one's will' means 'without the consent of the alleged victim.'" (People v. Lee (2011) 51 Cal.4th 620, 634, fn. 10.) "The essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape. Any sexual penetration, however slight, is sufficient to complete the crime." (§ 263.) Ejaculation is not an element of rape. All that is required is sexual penetration, however slight. (People v. Wallace (2008) 44 Cal.4th 1032, 1079.)

**C. Analysis**

An appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (People v. Kraft (2000) 23 Cal.4th 978, 1053.) An appellant who contends that some particular finding is not supported is required to set forth in her or her brief a summary of the material evidence on that issue. (People v. Dougherty (1982) 138 Cal.App.3d 278, 282.) Appellant makes five assignments of error in this case. We address each in turn.

**1. Physical Impossibility**

Appellant contends M.'s testimony described events that were physically impossible: "[M. testified] that she fought Herrera for five to seven minutes, while yelling at him, without waking [Maria Q.] who was sleeping in the same bed only inches away.... There was no evidence that [Maria Q.] was unable to waken from the commotion and yelling next to her because she had passed out from alcohol –she had had only four to five beers that night. [Citations.] In fact only minutes later, when M. was yelling at and hitting Herrera after returning from the bathroom, [Maria Q.] woke up right away. [Citation.] It is not possible that [Maria Q.] did not waken during the alleged rape itself. [¶] Nor did M.'s cousin Daniel and his friend Rico wake up. [Citation.] Even though it was a small house [citations], and M. supposedly was yelling at Herrera for five to seven minutes, neither of them was roused from their sleep."

"'"To warrant the rejection of the statements given by a witness who has been believed by a [finder of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment...." '" That is because "'"it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]"' [Citations.] Further, a jury is entitled to reject some portions of a witness' testimony while accepting others. [Citation.] Weaknesses and inconsistencies in eyewitness testimony are matters solely for the jury to evaluate." (People v. Allen (1985) 165 Cal.App.3d 616, 623.)

Here, the jurors could have made a number of inferences. For example, they could have surmised that Maria Q., Daniel, and Rico consumed more alcoholic beverages than Maria Q.

testified to, or that the beverages they did consume had a far greater impact on their ability to awaken than Maria Q. alluded to or implied during her testimony.

**2. Removal of M.'s Jeans**

Appellant contends "equally implausible was M.'s testimony that she went to bed wearing a pair of jeans, but that Herrera had taken off her jeans without her awakening. [Citations.]" Appellant points out that M. testified "when she went to bed at 1:00 a.m. she could feel a 'buzz' but was 'not wasted,' and that at 5:00 a.m., when [the] rape allegedly occurred, she was 'completely sober.' [Citations.]"

Dr. Alan Barbour testified an individual would have to consume eight normal sized beers or four 24–ounce beers before going to sleep at 1:00 a.m. in order to have a blood-alcohol level of 0.07 as M. did at 10:30 a.m. on September 13, 2009. Based on Dr. Barbour's testimony, the jury could have reasonably concluded that M. consumed more alcohol than she alluded to during her testimony, and that the effect of the alcohol was to dull her senses and make her unaware that her jeans were being removed as she slept.

**3. M.'s Recognition of Appellant**

Appellant contends M.'s explanation of how she recognized him is not reasonable or credible:

> "Before the harvest festival, M. had seen Herrera only twice – once on an errand at Home Depot, and on a few occasions at church. [Citations.] She had had no other contact with Herrera. [Citations.] Yet, she claimed that in the dark bedroom she was able to recognize Herrera on top of her by touching his hair and his chest. [Citations.] Given her extremely limited interaction with Herrera, her claim that she recognized his hair and chest in the dark is incredible."

Given the strong evidence of appellant's presence at Maria Q.'s home – as well as scientific evidence that overwhelmingly supported the conclusion that appellant's non-sperm DNA was inside M.'s vagina, and M.'s DNA was inside appellant's underwear – appellant's challenge to M.'s ability to recognize and identify him in Maria Q.'s bedroom does not compel a different result. Reviewing judges are in no position to determine the credit which should be accorded to witnesses or to weigh their testimony. Jurors are the exclusive judges of the credibility of witnesses and are the judges of the effect or value of the evidence addressed to them. (People v. Wilder (1957) 151 Cal.App.2d 698, 704–705.)

**4. M.'s Truthfulness**

Appellant contends M. was untruthful because she "insisted at trial that she had had only three to four beers all night [citations], but at 10:30 a.m. the next morning her blood alcohol content was 0.07 [percent]. [Citations.] The undisputed testimony of a forensic scientist was that M. had had eight to 10 beers. [Citations.]"

We review the evidence in the light most favorable to the respondent. (People v. Johnson, supra, 26 Cal.3d at p. 577.) "In making our determination, we do not reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact." (People v. Stewart (2000) 77 Cal.App.4th 785, 790.) Conflicts and even testimony that is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the jury to determine the credibility of a witness and the truth or falsity of the facts upon which such a determination depends. (People v. Janisse (1958) 162 Cal.App.2d 117, 122.)

> The jury could have reasonably rejected M.'s testimony with respect to the quantity of alcohol she consumed but accepted other portions of her testimony inculpating appellant in the charged offenses.

**5. Purported Fabricated Evidence**

Appellant argues:

> " ... M. testified that she was in a 'lot of pain' in her vagina when the SAFE nurse took vaginal swabs during the medical examination [citations], but the SAFE nurse saw no signs of trauma or lacerations to M.'s vagina or cervix. [Citations.] Her claim that she was in a lot of pain was simply another fabrication to bolster her story."

Under California law, it is the province of the trier of fact to weigh the evidence, judge the credibility of witnesses, and resolve inconsistencies and contradictions in the testimony. (People v. Knighton (1967) 250 Cal.App.2d 221, 231; People v. Hrisoulas (1967) 251 Cal.App.2d 791, 796.) Here, the jury could have reasonably accepted the testimony of M. and rejected that of the SAFE nurse, or alternatively, determined that M. did experience pain even though the SAFE nurse did not see any visible signs of trauma to M.'s body.

**6. Conclusion**

"'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' (People v. Jones (1990) 51 Cal.3d 294, 314 [ ].)" (People v. Ochoa (1993) 6 Cal.4th 1199, 1206.) An "inherent improbability claim ... based entirely on comparisons, contradictions and inferences ... amounts to nothing more than an attack on witness credibility, and cannot be the basis for a reversal of the judgment on appeal." (People v. Ennis, supra, 190 Cal.App.4th at p. 725.)

Appellant's contention amounts to an attack on witness credibility and, under the authority of Ennis, cannot be the basis for a reversal of the judgment on appeal.

(Doc. 18, Ex. A, pp. 7-9).

    B.  Federal Standard.

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, 319, the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows: "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Id., at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

9

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.'" See id., *quoting* Jackson, 443 U.S. at 319. Circumstantial evidence and inferences drawn therefrom may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. Except in the most exceptional of circumstances, Jackson does not permit a federal court to revisit credibility determinations.[2] Cavazos, v. Smith, __U.S. __, 132 S.Ct. 2, 3, 6 (2011); Bruce v. Terhune, 376 F.3d 950, 957-958 (9th Cir. 2004).

Moreover, in applying the AEDPA's deferential standard of review, this Court must also presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990).

C. Analysis.

The petition incorporates the argument raised by appellate counsel in the petition for review filed in the California Supreme Court. (Doc. 1, Ex. A). In the petition for review, appellate counsel does not deny that Petitioner had sex with the victim; rather, the only argument raised in the California Supreme Court, and thus the only argument factually exhausted in these proceedings, is that the evidence was insufficient to show lack of consent, primarily because, Petitioner argues, the victim's

---

[2] To the extent that the 5th DCA's opinion does not expressly cite the Jackson v. Virginia standard in analyzing the sufficiency claims herein, it should be noted that the California Supreme Court has expressly adopted the federal Jackson standard for sufficiency claims in state criminal proceedings. People v. Johnson, 26 Cal.3d 557, 576 (1980). Accordingly, the state court applied the correct legal standard, and this Court's only task is to determine whether the state court adjudication was contrary to or an unreasonable application of that standard.

testimony was implausible or unbelievable.

Petitioner cites the following reasons why the victim lacked credibility: (1) it is unbelievable that the victim could attempt to fight off Petitioner for five to seven minutes without waking Maria Q., who was sleeping in the same bed, or the individuals in other parts of this small house; (2) it is implausible that the victim could have her jeans removed without being aware of the fact, in light of how little alcohol the victim claims she consumed; (3) the victim's claim that she recognized her attacker as Petitioner solely by touching his hair and chest makes no sense, especially given how little contact she had previously had with Petitioner; and (4) inconsistencies in the victim's testimony show she was untruthful.  (Doc. 1, Ex. A, pp. 23-24).  Petitioner contends "inherently improbable" testimony from the sole witness cannot constitute substantial evidence to support a conviction.  (Id., p. 25).

The evidence presented at trial overwhelmingly supports the finding that Petitioner and the victim had sex: multiple witnesses, including the victim, identified Petitioner as the individual in the victim's bed; a substance consistent with Petitioner's genetic profile was found in the victim's vagina; and a substance containing the victim's genetic profile was found in Petitioner's underwear.  As such, the only issue subject to dispute is that of consent.  In its opinion, the 5th DCA dealt with each of Petitioner's arguments vis-à-vis consent in detail.

Briefly, the 5th DCA noted that, regarding the victim's inability to wake her bedmate, Maria Q., during the assault, the jury could have reasonably inferred that Maria Q. had consumed more alcohol at the Harvest Festival than she had testified about at trial.  Similarly, the court noted that the defense expert had opined that the victim would have had to consume at least eight regular beers prior to 1 a.m. in order to have a BAC of .07 later that morning.  Reasonably, a juror could have inferred that all of the household's inhabitants had overindulged in alcohol consumption at the festival, thus making it less likely that a disturbance such as that described by the victim would have awoken them.  In the same vein, the victim's consumption of at least eight beers could have reasonably led a juror to find that she was either unconscious or deeply asleep when Petitioner removed her jeans and assaulted her.  Finally, the mere fact that the victim testified that she had consumed three to four beers all night but that the BAC evidence suggested she had consumed much more, did not, by itself, render the victim's testimony regarding the sexual assault so suspect that, as a matter of law, no reasonable juror could

1  have believed her.  Instead, reasonable jurors could have concluded the victim and the other individuals
2  staying in the house that night had overindulged in drinking alcohol but that, understandably, they
3  would, at trial or in police interviews, underestimate their consumption rather than admit to drinking so
4  much that, once home, all or most of them were in a state of near-unconsciousness.

5        These inferences are reasonable, and the jurors were entitled to make them.  Given the liberal
6  standard of review under both the AEDPA and Jackson, it would not normally fall within the purview
7  of this Court to second-guess the factual findings of the state court jury.  Indeed, as the federal case law
8  instructs, this Court "must presume" that the factfinder properly resolved any conflicting inferences in
9  favor of the prosecution and the Court "must defer to that resolution."  Jackson, 443 U.S. at 326.  In so
10 doing, the Court must, again as required by federal case law, accord the state jury's factual findings
11 "near-total deference."  Bruce, 376 F.3d at 957.

12       In essence, Petitioner asks this Court to find, as a matter of law, that the victim's testimony was
13 not credible and thus to disregard all of it.  However, the extraordinary circumstances under which the
14 Court might agree to undertake such an extreme step are not present in this case.  Moreover, in addition
15 to the testimony of the victim, other evidence of lack of consent was presented at trial, including that
16 Petitioner had threatened the victim, the witness, and Maria Q. at the Harvest Festival, the victim
17 reacted forcibly and violently when she awoke during the sexual assault, and police officers and other
18 witnesses noted afterward that the victim appeared agitated, angry, and tearful.  Thus, reasonable jurors
19 could have inferred from that evidence, independent of the victim's testimony, that the sexual
20 intercourse was non-consensual.  Accordingly, the Court rejects Petitioner's claim that the evidence
21 was insufficient denies the petition.

22       The Court declines to issue a certificate of appealability.  A state prisoner seeking a writ of
23 habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an
24 appeal is only allowed in certain circumstances.  Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).
25 According to 28 U.S.C. § 2253, the court may issue a certificate of appealability only when a petitioner
26 makes a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  To make a
27 substantial showing, the petitioner must establish that "reasonable jurists could debate whether (or, for
28 that matter, agree that) the petition should have been resolved in a different manner or that the issues

presented were 'adequate to deserve encouragement to proceed further'." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (*quoting* Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In the present case, the Court finds that Petitioner has not made the required substantial showing of the denial of a constitutional right to justify the issuance of a certificate of appealability. Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Thus, the Court DECLINES to issue a certificate of appealability.

**ORDER**

Based upon this analysis, the Court **ORDERS**:

1. The petition for writ of habeas corpus (Doc. 1), is **DENIED with prejudice**;
2. The Clerk of the Court is DIRECTED to enter judgment and close the file;
3. The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **February 25, 2015**           /s/ Jennifer L. Thurston
                                                      UNITED STATES MAGISTRATE JUDGE